**CHEMLINE, INC., Appellant,**

v.

**CITY OF GRAND PRAIRIE, C. P. Waggoner, H. H. Milling, Aubrey Vickers, James Dee, Roy McGlothin and Fred Conover, Appellees.**

**CITY OF GRAND PRAIRIE, C. P. Waggoner, H. H. Milling, Aubrey Vickers, James Dee, Roy McGlothin and Fred Conover, Appellants,**

v.

**CHEMLINE, INC., Appellee.**

No. 22254.

United States Court of Appeals
Fifth Circuit.

July 6, 1966.

Rehearing Denied Aug. 8, 1966.

Grover Hartt, Jr., Tobolowsky, Hartt, Schlinger & Blalock, Dallas, Tex., for appellant-appellee.

Jerry D. Brownlow, Grand Prairie, Tex., for appellees-appellants.

Before RIVES, BROWN and MOORE,* Circuit Judges.

RIVES, Circuit Judge:

Chemline, Inc., owned by Mr. and Mrs. Leroy Fisher, operates two drive-in motion picture theaters in Grand Prairie, Texas, located on parts of the same property between U.S. Highway 80 on the north and Jefferson Boulevard on the south. Grand Prairie is a home rule city, abutting on its eastern limits the City of Dallas. The two theaters are known as the Twin Drive-In Theater. Twin West exhibits motion pictures suitable for general family viewing. Twin East exhibits so-called "art pictures." Mrs. Fisher testified that these include pictures where the nude female body is exhibited to the patrons of the theater as well as being visible from the public highways and streets. They include also movie screen scenes visible to the audience and to the people on the public highways and streets in which a female performer reveals her uncovered breasts. At Twin East only such so-called "adult" films are shown, which Mrs. Fisher con-

---

* Of the Second Circuit, sitting by designation.

ceded are not suitable to show to children.[1]

In 1963 Mr. and Mrs. Fisher were charged with the exhibition of an "obscene" motion picture in violation of Vernon's Ann.Texas Penal Code, Art. 527, a copy of which is attached as Exhibit A to this opinion. The case was dismissed because of the exemption written into the act, as follows:

"The provisions of this Act shall not apply to any motion pictures produced or manufactured as commercial motion pictures which (1) have the seal under the Production Code of the Motion Picture Association of America, Inc.; or (2) legally move in interstate commerce under Federal Law; or (3) are legally imported from foreign countries into the United States and have been passed by a Customs Office of the United States Government at any port of entry."

After this dismissal, various groups of citizens in Grand Prairie circulated petitions which read substantially as follows:

"We, the undersigned, do hereby petition the City of Grand Prairie to take necessary action to prohibit the Twin Drive-In Theatres located between Highway 80 and Jefferson Boulevard in east Grand Prairie from showing lewd, obscene, offensive pictures. These pictures are in full view of all persons using the above mentioned traffic routes."

Thereafter, the individual defendants (with the exception of Fred Conover, the Chief of Police), acting as the mayor and city council of Grand Prairie, passed two ordinances numbered 1621 and 1622. A copy of each of these ordinances is attached as Exhibits B and C, respectively, to this opinion.

Chemline, Inc. filed its complaint against Grand Prairie, its Mayor, City Councilmen, and Chief of Police, seeking to enjoin the enforcement of both ordinances, principally upon the ground that they abridge First Amendment freedoms of speech and expression. Grand Prairie and the individual defendants defended, seeking to enforce said ordinances under the general police power of the City and because they claim that the operation of Twin East presents a clear and present danger to the citizens of Grand Prairie.

After a hearing, the district court permanently enjoined the defendants from enforcing paragraphs VIa and VIII of Ordinance 1621. The defendants had earlier admitted that the standards set forth in VIa are too vague and had agreed to abandon that subdivision of the ordinance. Paragraph VIII reads as follows:

"*Unlawful to Exhibit Nude or Semi-nude Pictures on Theatre Screens within View of Public Street or Highway.* It shall be unlawful for any licensee, ticket seller, ticket taker, usher, motion picture machine operator and any other person connected with or employed by any licensee to show or exhibit at a theater in the City or to aid or assist in such exhibition any motion picture, slide, or other exhibit which is visible from any public street or highway in which the bare buttocks or the bare female breasts of the human body are shown or in which striptease, burlesque or nudist-type scenes constitute the main or primary material of such movie, slide or exhibit."

The district court denied Chemline's prayer for an injunction against the enforcement of the remainder of Ordinance 1621 and against the enforcement of Ordinance 1622. The City and the individual defendants appeal from that part of the judgment enjoining them from enforcing paragraph VIII of Ordinance 1621. Chemline appeals from that part of the judgment denying its prayer for an injunction against the enforcement of the remainder of Ordinance

1. She further testfied that, "I did not show any nudes on that Twin screen east before 10:30 or 11 o'clock. Children should be in bed by then."

1621 and against the enforcement of Ordinance 1622.

## CITY'S APPEAL

As has been stated, the appeal of the City and its officers is from that part of the final judgment which enjoins them from enforcing paragraph VIII of Ordinance 1621, which has been quoted.

The City concedes that, "The guarantees of free speech and press set by the First Amendment to the Constitution of the United States and protected by the Fourteenth Amendment to the Constitution of the United States was extended to the motion picture industry in Burstyn v. Wilson, 343 U.S. 495, 72 S.Ct. 77 [777, 96 L.Ed. 1098]." It further concedes that the pictures and scenes to which the quoted paragraph of the ordinance applies may not necessarily be "obscene" as defined by the Supreme Court. It emphasizes, however, that the paragraph applies only when the exhibit is visible from a public street or highway, and insists that the paragraph is a reasonable restriction necessary to safeguard the public interest.

The district court held that paragraph VIII violates the First Amendment. It concluded that there was no evidence that the *average person* from the highway viewing pictures prohibited by the paragraph would be invited to anti-social conduct, that parking cars on the shoulder of the highway in violation of the no parking ordinance presents no clear and present danger, that the evidence of accidents and of possible traffic hazards in the vicinity of Twin East is insufficient to show such a threat to public safety as to create a clear and present danger. The district court defined the test of clear and present danger as follows: "In order to show a clear and present danger, the substantive evil must be extremely serious, and the degree of imminence extremely high before the freedom guaranteed by the First Amendment will be interfered with. Such danger is not shown to exist requiring the enactment of Article VIII of Ordinance 1621."

We think that the district court has fallen into the error of applying the term "clear and present danger" as a mechanical test without regard to the context of its application. See American Communications Association, CIO v. Douds, 1950, 339 U.S. 382, 394, et seq., 70 S.Ct. 674, 94 L.Ed. 925.

■ It is almost self-evident that a city is well within its legitimate police powers in enacting reasonable ordinances to protect children in its public streets and highways from viewing "bare buttocks" or "bare female breasts" or "striptease, burlesque or nudist-type scenes which constitute the main or primary material." The City introduced witnesses to show that the Twin East screen was clearly and plainly visible for approximately nine-tenths of a mile on U. S. Highway 80, and for about three-tenths of a mile on Jefferson Boulevard. Mr. Burr, Lieutenant of Police, testified to a series of moral offenses on the premises, including the forcible rape of a fourteen-year-old girl and teenagers arrested for illegal possession of alcohol, of lewd material, and caught in the act of masturbation. Dr. Glenn, a psychiatrist, testified as to the harmful effects on children viewing such scenes from the highways.

"A. * * * For instance, a young child who is being brought up in a rather strict home with certain standards that prohibit the discussion of this kind of sexual stimulation—even in the relatively short time that the child was exposed to this might arouse considerable question in their mind and a great deal of concern, and this would range from the age of about four on up to about 12 or 14. By that time they most likely already know most of the facts.

"Q. How might this concern or disturbance manifest itself in children in this age classification?

"A. Well, there are many ways it could manifest itself. It could create doubt in their minds about what their parents are telling them, why haven't

my parents told me about this kind of thing, and weaken the parental structure. It could encourage fantasies along this line which would be viewed as very forbidden, and generally, a rather undesirable conflict might develop in the child.

\* \* \* \* \* \*

"A. \* \* \* I think if you get a child who has already a somewhat shakey environment and who already has considerable problems in their sexual fantasy area, it might aggravate this quite considerably.

\* \* \* \* \* \*

"Q. What about the adolescent years, Doctor, what effect will we see from the exhibition of this type of thing during the adolescent years?

"A. Shall we say it might heat passions that were somewhat latent or not very active, to try and reproduce what was being shown on the screen."

Lieutenant De Wolfe, the police officer in charge of traffic, testified that he had found it impossible to effectively enforce parking regulations adjacent to the theater.

"Primarily, because of the frequency of the occurrence of parking violations in that area and the shortage of police manpower in the City of Grand Prairie, it would be impractical. We would nearly have to keep an officer right there on the spot, during the hours of theatre operation, solely to enforce the No Parking regulation."

He further testified to instances of erratic driving and to a number of accidents which in his opinion were caused by "failure to keep a proper lookout or failure to keep one's mind on his business."

It may be noted that paragraph VIII of the ordinance is not directed toward the paid audience for which the pictures are intended. As found by the district court, the patron buys a ticket for admission and parks his automobile in a position on a ramp in close proximity to a post on which is located an in-car-speaker. "For the enjoyment of any of the commercial motion pictures exhibited by the plaintiff it is necessary to have the benefit of a speaker which reproduces the sound tract that runs in conjunction with the action viewed upon the screen." There was no evidence to show how expensive it might be to construct a wall or screen which would confine the exhibitions to the view of those for whom they were intended.

Since Chemline admitted that the pictures were not suitable for viewing by children and undertook not to admit children, it seems not unreasonable for the City to require that one exhibiting such "adult" films for a profit should do so on premises not accessible to the view of children.

■ So far as appears from its reasoning, the district court gave no separate consideration to the harmful effects of such pictures on children, but confined its consideration to their effect on the "average person." It was not proper thus to ignore the special interests of children. As said by Mr. Justice Brennan in Jacobellis v. State of Ohio, 1964, 378 U.S. 184, 195, 84 S.Ct. 1676, 1682, 12 L.Ed.2d 793:

"We recognize the legitimate and indeed exigent interest of States and localities throughout the Nation in preventing the dissemination of material deemed harmful to children. But that interest does not justify a total suppression of such material, the effect of which would be to 'reduce the adult population \* \* \* to reading only what is fit for children.' Butler v. Michigan, 352 U.S. 380, 383 [77 S.Ct. 524, 526, 1 L.Ed.2d 412]. State and local authorities might well consider whether their objectives in this area would be better served by laws aimed specifically at preventing distribution of objectionable material to childen, rather than at totally prohibiting its dissemination. Since the present conviction is based upon exhibition of the film to the public at large and not upon its exhibition to children, the

judgment must be reviewed under the strict standard applicable in determining the scope of the expression that is protected by the Constitution." [2]

■ It seems to us that the City has followed the suggestion of the Supreme Court and has enacted an ordinance reasonably aimed at preventing the exhibition of objectionable pictures to children.

If there be capacity for evil in a motion picture "it may be relevant in determining the permissible scope of community control." Joseph Burstyn, Inc. v. Wilson, 1952, 343 U.S. 495, 502, 72 S.Ct. 777, 780, 96 L.Ed. 1098. As said in American Communications Association, CIO v. Douds, supra, 339 U.S. at 397, 70 S.Ct. at 683: "When the effect of a statute or ordinance upon the exercise of First Amendment freedoms is relatively small and the public interest to be protected is substantial, it is obvious that a rigid test requiring a showing of imminent danger to the security of the Nation is an absurdity." See also Adams Newark Theater Co. v. City of Newark, 1957, 354 U.S. 931, 77 S.Ct. 1395, 1 L.Ed.2d 1533; Breard v. City of Alexandria, 1951, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233; Feiner v. People of State of New York, 1951, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 267; Kovacs v. Cooper, 1949, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513; Chaplinsky v. State of New Hampshire, 1942, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031; Cox v. State of New Hampshire, 1941, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049.

■ In brief, the right to disseminate motion pictures is not absolute. It does not mean that any motion picture can be distributed at any time, at any place, and under any circumstances. We think that the City of Grand Prairie acted well within its authority in adopting paragraph VIII of Ordinance 1621.

## CHEMLINE'S APPEAL.

■ Chemline attacks the definition of "obscene" used in both ordinances, viz: "For purposes of this ordinance, the word 'obscene' is defined as whether to the average person, applying contemporary national standards, the dominant theme of the material taken as a whole appeals to prurient interests." Chemline insists that that definition omits the quality of "patent offensiveness" required by Manual Enterprises, Inc. v. Day, 1962, 370 U.S. 478, 486, 82 S.Ct. 1432, 1436, 8 L.Ed.2d 639:

"Obscenity under the federal statute thus requires proof of two distinct elements: (1) patent offensiveness; and (2) 'prurient interest' appeal. Both must conjoin before challenged material can be found 'obscene' under § 1461. In most obscenity cases, to be sure, the two elements tend to coalesce, for that which is patently offensive will also usually carry the requisite 'prurient interest' appeal. It is only in the unusual instance where, as here, the 'prurient interest' appeal of the material is found limited to a particular class of persons that occasion arises for a truly independent inquiry into the question whether or not the material is patently offensive."

The two ordinances adopted substantially the test of obscenity as stated in Roth v. United States, 1957, 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498, viz: "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." Instead, however, of referring to "contemporary community standards," the ordinances referred to "contemporary national standards," in accord with the case of Jacobellis v. State of Ohio, 1964, 378 U.S. 184, 195, 84 S.Ct. 1676, 12 L.Ed.2d 793. The definition of obscenity in Roth, as thus qualified, has

2. It should be noted that Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 969, 16 L.Ed.2d 31, n. 13, stands for the proposition that whether a matter is "obscene" may depend upon whether its distribution is limited to a particular class of persons.

been consistently followed in every obscenity case thereafter decided by the Supreme Court. See Bantam Books, Inc. v. Sullivan, 1963, 372 U.S. 58, 65, 83 S.Ct. 631, 9 L.Ed.2d 584; Jacobellis v. State of Ohio, supra; Freedman v. State of Maryland, 1965, 380 U.S. 51, 52, 85 S.Ct. 734, 13 L.Ed.2d 649; Ginzburg v. United States, 1966, 383 U.S. 463, 86 S.Ct. 942, 969, 16 L.Ed.2d 31; Mishkin v. State of New York, 1966, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56; A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Com. of Massachusetts, 1966, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1.

It was not the intention of Manual Enterprises, Inc. v. Day, supra, to add to the Roth definition a separate element of "patent offensiveness." On the contrary, that opinion clearly indicated that what it referred to as "patent offensiveness" was already included in the Roth definition. "These magazines cannot be deemed so offensive on their face as to affront current community standards of decency—a quality that we shall hereafter refer to as 'patent offensiveness' or 'indecency.'" 370 U.S. at 482, 82 S.Ct. at 1434. Any possible doubt on that score was removed by Memoirs v. Massachusetts, supra, where it is said:

"We defined obscenity in Roth in the following terms: '[W]hether to the average persons, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' 354 U.S., at 489. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." (383 U.S. 418, 86 S.Ct. 977.)

In short, if a work appeals to the prurient interest of the average American judged by contemporary national standards, then it is *ipso facto* "patently offensive."

Paragraph IV of Ordinance 1621 imposes a license fee as follows:

"*License Fee.* An application for license hereunder shall be accompanied by a license fee of $25.00 to defray the expense of investigation and issuance of license, which fee shall be returned to the applicant if the license is not issued. Any license issued hereunder shall be renewable on the 1st day of January of each succeeding year after the date of issuance upon payment of a renewal fee of $10.00."

Chemline insists that that license fee is an unreasonable tax upon the right of free communication in violation of the First Amendment, and relies principally upon Grosjean v. American Press Co., 1936, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660. Without elaborating upon the history of that case, we think it clear that it has no application to this small license tax, for as there said: "It is not intended by anything we have said to suggest that the owners of newspapers are immune from any of the ordinary forms of taxation for support of the government. But this is not an ordinary form of tax, but one single in kind, with a long history of hostile misuse against the freedom of the press." 297 U.S. at 250, 56 S.Ct. at 449. Similarly, Murdock v. Com. of Pennsylvania, 1943, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, has no application to "a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question." 319 U.S. 113, 114, 63 S.Ct. 875. An operator of a motion picture theater, like others, must pay equitable and nondiscriminatory taxes on its business. See Associated Press v. National Labor Relations Board, 1937, 301 U.S. 103, 133, 57 S.Ct. 650, 81 L.Ed. 953; Arizona Publishing Co. v. O'Neil, D.C.Ariz.1938, 22 F.Supp. 117, aff'd, 304 U.S. 543, 58 S.Ct. 950, 82 L.Ed. 1518. See also Cox v. State of New Hampshire, 1941, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049.

■ Chemline does not and cannot question the propriety of requiring theaters to conform to health, building, electrical, fire and sanitary standards. The nominal license fee is imposed expressly to "defray the expense of investigation and issuance of license." There is no evidence that that fee is excessive. Chemline's constitutional attacks upon the two ordinances are not well taken.

■ Chemline insists, however, that Art. 527 of the Penal Code of Texas [3] precludes the defendants from passing an ordinance regulating commercial motion pictures in the exempted categories. The district court held that:

"Article 527 of the Penal Code of the State of Texas prohibiting obscene pictures but excluding from its provisions motion pictures produced or manufactured as commercial motion pictures which (1) have the seal under the production Code of the Motion Picture Association of America, Inc., or (2) legally move in interstate commerce under Federal law, or (3) are legally imported from foreign countries into the United States and have passed the Customs Office of the United States Government at any port of entry, leaves the field of regulation of such pictures excluded from Article 527 to the City.

"Since motion pictures excluded from Article 527 of the Penal Code of the State of Texas, as set out in the above conclusion, the power to regulate such pictures is delegated to the City of Grand Prairie and are subject to regulation by the City." [4]

The only Texas case dealing with the effect of article 527's exclusion is Janus Films, Inc. v. City of Fort Worth, Tex. Civ.App.1962, 354 S.W.2d 597. Without explanation or discussion, it holds that the exclusion does not prevent home-rule cities from prohibiting the exhibition of obscene movies. The Texas Supreme Court in refusing writ of error, n. r. e., 163 Tex. 616, 358 S.W.2d 589, did the unusual thing of writing a brief opinion. The Court said that the trial court had not abused its discretion in denying a temporary injunction of the City ordinance, since the purpose of such injunction is to preserve the status quo and had the court granted it, the movie would have been shown and the status quo would not have been preserved. The Court further said: "This opinion is not to be construed as passing on the merits of the case in any respect."

In the light of the Texas Supreme Court's opinion, the Court of Civil Appeal's decision is not very convincing. We have considered the advisability of invoking the abstention doctrine, but we reject that idea in view of the decisions of the Texas courts in United Services Life Ins. Co. v. Delaney (Tex.Civ.App. 1965), 386 S.W.2d 648, and (Tex.Sup.Ct. 1965) 396 S.W.2d 855. The only evidence which we have under the Erie doctrine is the decision of the Texas Court of Civil Appeals in the *Janus Films* case, supra. We therefore agree with the district court as to the effect of article 527 of the Penal Code of Texas.

On the City's appeal, that part of the judgment enjoining the City and its officers from enforcing paragraph VIII of Ordinance 1621 is reversed. On Chemline's appeal, that part of the judgment denying its prayer for an injunction against the enforcement of the remainder of Ordinance 1621 with the exception of paragraph VIa and against the enforcement of Ordinance 1622 is affirmed. The costs of this appeal are assessed against Chemline, Inc.

Although the mandate in this case will issue in the usual course, Chemline is granted permission to call to the attention of this Court by delayed application for rehearing any ruling that may hereafter be entered by an Appellate Court

---

3. A copy of which is attached as Exhibit A to this opinion.

4. See to the same effect, the district court's holding in Interstate Circuit, Inc. v. City of Dallas, N.D.Tex.1965, 247 F. Supp. 906, 909.

of Texas which is authoritatively contrary to the ruling of the Court of Civil Appeals in the *Janus Films* case, supra.

Affirmed in part and reversed in part.

MOORE, Circuit Judge, concurs in the result—See concurring opinion attached.

### EXHIBIT A

## TEXAS PENAL CODE

"Art. 527.  *Acts involving obscene articles, objects and materials; fines and penalties; exemptions*

"Section 1.  Whoever shall knowingly photograph, act in, pose for, model for, print, sell, offer for sale, give away, exhibit, televise, publish, or offer to publish, or have in his possession or under his control, or otherwise distribute, make, display, or exhibit any obscene book, magazine, story, pamphlet, paper, writing, card, advertisement, circular, print, pictures, photograph, motion picture film, image, cast, slide, figure, instrument, statue, drawing, phonograph record, mechanical recording, or presentation, or other article which is obscene, shall be fined not more than One Thousand Dollars ($1,000) nor imprisoned more than one (1) year in the county jail or both.

"Sec. 2.  Whoever shall knowingly offer for sale, sell, give away, exhibit, televise, or otherwise distribute, make, display, or exhibit any obscene book, magazine, story, pamphlet, paper, writing, card, advertisement, circular, print, pictures, photograph, motion picture film, image, cast, slide, figure, instrument, statue, drawing, phonograph record, mechanical recording, or presentation, or other article which is obscene, to a minor shall be fined not more than Two Thousand, Five Hundred Dollars ($2,-500) nor imprisoned in the county jail more than two (2) years or both.

"Sec. 3.  For purposes of this article the word 'obscene' is defined as whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appears to prurient interests. Provided, further, for the purpose of this article, the term 'contemporary community standards' shall in no case involve a territory or geographic area less than the State of Texas.

"Sec. 4.  Whoever shall be convicted for the second time of a violation of this article shall be deemed guilty of a felony and shall be punished by confinement in the State penitentiary for not more than five (5) years or by a fine of not more than Ten Thousand Dollars ($10,-000) or by both such fine and imprisonment.

"Sec. 5.  It shall be a defense to any charges brought hereunder if such prohibited matter or act shall be regularly in use in any bona fide, religious, educational or scientific institution or the subject of a bona fide scientific investigation.

"The provisions of this Act shall not apply to any motion pictures produced or manufactured as commercial motion pictures which (1) have the seal under the Production Code of the Motion Picture Association of America, Inc.; or (2) legally move in interstate commerce under Federal Law; or (3) are legally imported from foreign countries into the United States and have been passed by a Customs Office of the United States Government at any port of entry.

"The provisions of this Act shall not apply to any daily or weekly newspaper.

"Sec. 6.  The district courts of this State and the judges thereof shall have full power, authority, and jurisdiction, upon application by any district or county attorney within their respective jurisdictions, to issue any and all proper restraining orders, temporary and permanent injunctions, and any other writs and processes appropriate to carry out and enforce the provisions of this Act. As amended Acts 1955, 54th Leg., p. 386, ch. 107, § 1; Acts 1957, 55th Leg., p. 425, ch. 203, § 1; Acts 1961, 57th Leg., p. 1041, ch. 461, § 1."

## EXHIBIT B

### "ORDINANCE NO. 1621

"AN ORDINANCE LICENSING AND REGULATING THEATERS IN THE CITY OF GRAND PRAIRIE: PROVIDING FOR INSPECTION AND SUPERVISION OF SAME, AND SETTING FORTH STANDARDS OF OPERATION: PRESCRIBING CERTAIN UNLAWFUL ACTS IN CONNECTION WITH THEATERS: AND PROVIDING PENALTIES FOR VIOLATION OF ITS PROVISIONS.

"BE IT ORDAINED BY THE CITY COMMISSION OF THE CITY OF GRAND PRAIRIE, TEXAS:

### I.

"*Definitions.* For the purposes of this ordinance, the following terms, phrases, words and their derivations shall have the meaning given herein. When not inconsistent with the context, words so used in the present tense include the future, words in the plural number include the singular number, and the words in the singular number include the plural number.

"The word 'shall' is always mandatory and not merely directory.

"(a) 'City' is the City of Grand Prairie, Texas.

"(b) The 'Chief of Police' is the Chief of Police of the City of Grand Prairie, Texas.

"(c) 'Theater' is any premise in which motion pictures are projected upon a screen or a theatrical performance given for viewing by patrons which is open to the public.

"(d) 'Licensee' is the person having City license in full force and effect issued hereunder for the operation of a theater.

"(e) 'Person' is any person, firm, partnership, association, corporation, company or organization of any kind.

"(f) For purposes of this ordinance, the word 'obscene' is defined as whether to the average person, applying contemporary national standards, the dominant theme of the material taken as a whole appeals to prurient interests.

### II.

"*License Required.* It shall be unlawful for any person to construct, operate or maintain a theater within the City without having a valid license therefor in force and effect under the terms and provisions of this ordinance.

### III.

"*Application for License.* Application for license issued hereunder shall be made upon blank forms prepared and made available by the Chief of Police and shall state:

"(a) The name, home address and proposed business address of the applicant.

"(b) The number of patrons or customers which the theater is designed to accommodate.

"(c) The hours of operation of said theater.

"(d) The names, addresses and number of employees and attendants at said theater. In the event such employees and attendants are from time to time changed at such theater, immediate notice of the names, addresses of new employees shall be given to the Chief of Police.

"(e) Such other information as the Chief of Police shall find reasonably necessary to effectuate the purpose of this ordinance and to arrive at a fair determination of whether the terms of this ordinance have been complied with.

### IV.

"*License Fee.* An application for license hereunder shall be accompanied by a license fee of $25.00 to defray the expense of investigation and issuance of license, which fee shall be returned to the applicant if the license is not issued. Any license issued hereunder shall be renewable on the 1st day of January of each succeeding year after the date of issuance upon payment of a renewal fee of $10.00.

### V.

"*Investigation by Chief of Police.* Within fifteen days after receipt of an

application as provided for herein, the Chief of Police shall cause an investigation to be made of the applicant and his proposed theater operation.

### VI.

"*Standards for Issuance.* The Chief of Police shall issue a license hereunder when he finds:

"(a) That the applicant and all employees and attendants are of good moral character and capable of operating the proposed business in the manner consistent with the public safety and good morals; and

"(b) That the requirements of this ordinance and of all other governing laws and ordinances have been met.

### VII.

"*Duties of Licensee.* It shall be unlawful for any licensee to operate a theater in the City without complying with the following requirements and standards of operation:

"(a) *Conduct and Operation.*

"(1) *Quiet and Good Order.* The licensee shall maintain quiet and good order upon the premises where any theater is operated and loitering shall not be permitted in or about the entrances to or exits from such theater.

"(2) *Obscene and Misleading Advertising.* Licensee shall not permit any obscene advertising on the premises of any theater, and no pictures or other form of advertising shall be permitted which is not true and descriptive of the theatrical performance or moving picture entertainment so advertised, or which misleads or misinforms the public as to the nature of the picture or entertainment to be exhibited.

"(3) *Gambling Prohibited.* The licensee shall not, either directly or indirectly maintain, operate or carry on any lottery, game of chance, game of skill, bank night, screeno, luck-o-grams, or any other games of similar nature, or engage in any similar device or plan.

"(4) *Prizes Prohibited.* The licensee shall not make a gift or offer a prize or other thing of value in connection with the operation of such theater as a means of inducing people to attend or buy tickets for such theatre; and the licensee shall not advertise or represent to the public that any gift, prize or thing of value will be given in connection with attendance or purchase of tickets for said theater.

"(5) *Intoxicating Liquors.* No person, upon the premises of a theater, whether in or outside of an automobile, shall have in his possession or under his control, or offer to give to another to drink, any intoxicating liquors, nor shall a licensee hereunder permit such conduct.

"(b) *Standards for Maintenance of Premises.*

"(1) *Access.* The licensee shall provide access available to public streets or other public ways from at least one point at all times. Such means of access shall be kept clear by the licensee at all times to facilitate the departure of persons from the premises upon which the theater is operated and to permit entrance of fire apparatus or other emergency equipment in case of emergency.

"(2) *Lighting.* Exits and aisles and passageways leading to them shall be kept adequately lighted by the licensee at all times when open to the public. The licensee shall provide artificial light whenever natural light is inadequate.

"(3) *Electrical Installations.* Except as otherwise provided by law or City ordinance, the licensee shall provide electrical installations conforming to the requirements of the electrical code of the City. The electrical system shall be installed, maintained and operated in a safe and workmanlike manner. The electrical system and equipment shall be isolated from the public by proper elevation or guarding, and all electrical fuses and switches shall be enclosed in approved enclosures. Cables on the ground in areas traversed by the public shall be placed in trenches or protected by approved cover. The electrical installations shall be inspected and approved by

the City Electrical Inspector before the theater is opened to the public and shall thereafter be open to inspection by the Electrical Inspector at all reasonable times.

"(4) *Fire Extinguishing Equipment.* Fire extinguishing equipment shall be furnished by the licensee in such amount and in such locations as may be directed by the City Fire Marshal. Fire extinguishing equipment shall be inspected and approved by the City Fire Marshal before the theater is opened to the public and shall thereafter be open to inspection by the City Fire Marshal at all reasonable hours.

"(5) *Sanitary Facilities.* Adequate and proper sanitary facilities, approved by the Department of Health, shall be provided by the licensee.

"(6) *Attendants.* At all times when the theater is open to the public, licensee shall provide an adequate number of qualified attendants on duty at all times, who shall patrol the aisles, exits and entrances of the theater to see that order is maintained, that disorderly or immoral conduct is prevented, that the entrances and exits are kept free from congestion, and that this ordinance and all other governing ordinances, rules and regulations pertaining to theaters are observed.

"(7) *Noise.* In drive-in theaters, excessive noise shall not be permitted, and individual loud speakers shall be provided by each car and no central loud speaker system shall be operated on such premises.

"(8) *Commercial Activities.* Any sale of soft drinks, confections or other articles of merchandise on the premises where any theater is operated shall be governed by the laws and ordinances governing such business and shall require the same license as if such sales were conducted elsewhere.

### VIII.

"*Unlawful to Exhibit Nude or Semi-nude Pictures on Theater Screens Within View of Public Street or Highway.* It shall be unlawful for any licensee, ticket seller, ticket taker, usher, motion picture machine operator and any other person connected with or employed by any licensee to show or exhibit at a theater in the City or to aid or assist in such exhibition any motion picture, slide, or other exhibit which is visible from any public street or highway in which the bare buttocks or the bare female breasts of the human body are shown or in which striptease, burlesque or nudist-type scenes constitute the main or primary material of such movie, slide or exhibit.

### IX.

"*Revocation of License.* Upon violation of any of the terms hereof by any licensee or the failure or refusal of any licensee to comply with the provisions hereof, the City Commission of the City may, after public hearing, revoke or suspend the license herein provided for under the procedure hereinafter set out:

"(a) The Chief of Police shall report all violations of this ordinance or the failure or refusal of any licensee to comply with any of the provisions hereof to the City Commission.

"(b) Upon receipt of such report, the City Commission may determine a time and place for the holding of a public hearing to determine whether or not any license issued hereunder shall be revoked or suspended for any period of time.

"(c) Written notice of the time and place of such hearing shall be given to the licensee subject thereto not less than ten days prior to the time of such hearing.

"(d) The licensee charged with violation of this ordinance shall be given an opportunity to appear in person and be represented by counsel at the hearing herein provided for, and shall have the right to examine or cross-examine all witnesses at such hearing.

"(e) The City Commission shall have the power to require by subpoena the attendance of persons or the production of evidence at such public hearing.

"(f) At said public hearing, the City Commission shall hear all evidence rela-

tive to the alleged violation of this ordinance and shall make fact findings relative to such violations.

"(g) If the City Commission of the City shall find that a violation of this ordinance has occurred, it may order the license of the licensee violating any term or provision hereof suspended or revoked for a definite period of time.

"(h) Any licensee whose license shall be revoked hereunder may appeal from the order of the City Commission suspending or revoking such license by appropriate proceedings in the proper court of law; provided, however, that the proceedings by which it is sought to set aside any order of the City Commission made hereunder shall be commenced within fifteen days of the date of the order sought to be rescinded or reversed.

### XI.

"*Investigation by Chief of Police.* Any licensee holding a license hereunder shall admit without charge the Chief of Police or his representative at any time upon the premises covered by such license for the purpose of investigating such premises to determine whether or not the provisions of this ordinance are being complied with, and the Police Department of the City is hereby specifically authorized to seize and hold as evidence any film, slide or other material or paraphernalia used in connection with any violation of this ordinance for the purpose of any trial or hearing commenced or held hereunder.

### XII.

"*Severability.* Each word, phrase, paragraph and section of this ordinance is hereby declared to be an individual section or provision, and the holding of any word, phrase, paragraph or section to be void, ineffective or unconstitutional for any cause whatsoever, shall not be deemed to affect any other word, phrase, paragraph or section hereof or the application of any word, phrase, section or paragraph to circumstances or facts not connected with such holding.

### XIII.

"*Repeal of Conflicting Ordinances.* All ordinances or parts of ordinances in conflict herewith shall be, and they hereby are, repealed to the extent of such conflict.

### XIV.

"*Effective Date.* This ordinance shall become in full force and effect from and after 30 days after its passage and publication as required by law and the Charter of the City.

### EXHIBIT C

### "ORDINANCE NO. 1622

"AN ORDINANCE PROHIBITING THE SHOWING OF OBSCENE MOVIES IN THE CITY OF GRAND PRAIRIE: DEFINING THE TERM 'OBSCENE'; PROVIDING FOR A PENALTY FOR VIOLATION HEREOF; PROVIDING A SEVERABILITY CLAUSE AND EFFECTIVE DATE HEREOF.

"BE IT ORDAINED BY THE CITY COMMISSION OF THE CITY OF GRAND PRAIRIE, TEXAS:

### I.

"*Definition.* For purposes of this ordinance, the word 'obscene' is defined as whether to the average person, applying contemporary national standards, the dominant theme of the material taken as a whole appeals to prurient interests.

### II.

"*Unlawful to Exhibit Obscene Movie.* It shall be unlawful for any person operating a motion picture theater in the City of Grand Prairie and for any employee, ticket seller, ticket taker, usher, motion picture machine operator and any other person connected with or employed by any such person to exhibit, or to show or exhibit or to aid or assist in the exhibition of any obscene motion picture, slide or exhibit in the City of Grand Prairie.

### III.

"*Penalty.* Any person violating any of the terms of this ordinance or failing or refusing to comply with the provi-

sions hereof, shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in an amount of not less than $50.00 nor more than $200.00, and the license of such person to operate a movie theater in the City of Grand Prairie shall be suspended for a period of not less than three nor more than sixty days.

IV.

"*Severability.* Each word, phrase, paragraph and section of this ordinance is hereby declared to be an individual section or provision, and the holding of any word, phrase, paragraph or section to be void, ineffective or unconstitutional for any cause whatsoever, shall not be deemed to affect any other word, phrase, paragraph or section hereof or the application of any word, phrase, section or paragraph to circumstances or facts not connected with such holding.

V.

"*Repeal of Conflicting Ordinances.* All ordinances or parts of ordinances in conflict herewith shall be and they hereby are, repealed to the extent of such conflict.

VI.

"*Effective Date.* This ordinance shall become in full force and effect from and after five days after its passage and publication as required by law and the Charter of the City of Grand Prairie."

MOORE, Circuit Judge (concurring in the result):

As to the disposition of Chemline's appeal, I am in accord.

As to the City's appeal, I agree that paragraph VIII of Ordinance 1621, which prohibits the exhibition of pictures of bare buttocks or bare female breasts by movie theater licensees or their agents if the pictures are visible from any public street or highway, is constitutional; but I rest my conclusion on grounds other than those on which the majority relies.

Paragraph VIII attempts to prevent (1) the exhibition of anatomical areas which would not meet with the approval of the Anthony Comstocks of the community, (2) when such scenes are visible from the public highway. Insofar as the first phase of the paragraph is addressed to possible obscenity, this aspect is covered by Ordinance 1622, held constitutional on Chemline's appeal. Paragraph VIII does not attempt to equate the mere exhibition of bare breasts and buttocks with obscenity.

As to the second phase, the testimony relating to the traffic hazard caused by exhibition of "nudie" movies provides an ample basis upon which to uphold the constitutionality of the paragraph. Not only were cars continually parked on the shoulder of the road; accidents in the vicinity of the Twin East on Highway 80 during the hours of theater operation jumped from a total of 15 in the four years before the theater started showing "nudies" to a total of 29 in the four years since that transformation. This seems danger enough to warrant regulation, particularly since the ordinance in question will not prevent the exhibition of such films, but only the exhibition of such films when they are visible from the road.

For this reason, I concur in the result reached in Judge Rives' opinion.