**INTERSTATE CIRCUIT, INC., et al.,**
**Appellants,**

v.

**CITY OF DALLAS, Appellee,**

**CITY OF DALLAS, Appellant,**

v.

**INTERSTATE CIRCUIT, INC., et al.,**
**Appellees.**

**No. 23306.**

United States Court of Appeals
Fifth Circuit.

Aug. 30, 1966.

Rehearing Denied Oct. 18, 1966.

Grover Hartt, Jr., Tobolowsky, Hartt, Schlinger & Blalock, Dallas, Tex., for appellants.

N. Alex Bickley, City Atty., Ted P. MacMaster, Asst. City Atty., Dallas, Tex., for City of Dallas.

Paul Carrington, Dan McElroy, Dallas, Tex., Carrington, Johnson & Stephens, Dallas, Tex., of counsel, for Columbia Pictures Corporation, Metro-Goldwyn-Mayer, Inc., Paramount Film Distributing Corporation, Twentieth Century-Fox Film Corporation, United Artists Corporation, Universal Film Exchanges, Inc., Warner Bros. Pictures, Distributing Corporation, Distributors.

Before WISDOM and THORNBERRY, Circuit Judges, and COX, District Judge.*

\* William Harold Cox, United States District Judge for the Southern District of Mississippi, sitting by designation.

THORNBERRY, Circuit Judge.

The City of Dallas, Texas, passed Ordinance No. 11284 [1] requiring the classification of motion pictures as "suitable" or "not suitable" for young persons. "Young person" is defined as one under under the age of sixteen. In the preamble the ordinance recites the conclusion of the City Council that motion pictures "are one of the contributing causes to juvenile delinquency, sexually promiscuous behavior, and along with other factors, tend to incite criminal behavior on the part of young persons. * * *" It is also noted that a great portion of the movies shown are available for screening more than thirty days prior to their initial exhibition and that the benefits of classification to the public will far exceed the burden placed on the motion picture industry. "Not suitable for young persons" is defined as

"(1) Describing or portraying brutality, criminal violence or depravity in such manner as to be, in the judgment of the Board, likely to incite or encourage crime or delinquency on the part of young persons; or

"(2) Describing or portraying nudity beyond the customary limits of candor in the community, or sexual promiscuity or extramarital or abnormal sexual relations in such a manner as to be, in the judgment of the Board, likely to incite or encourage delinquency or sexual promiscuity on the part of young persons or to appeal to their prurient interest.

"A film shall be considered 'likely to incite or encourage' crime delinquency or sexual promiscuity on the part of young persons, if, in the judgment of the Board, there is a substantial probability that it will create the impression on young persons that such conduct is profitable, desirable, acceptable, respectable, praiseworthy or commonly accepted. A film shall be considered as appealing to 'prurient interest' of young persons, if in the judgment of the Board, its calculated or dominant effect on young persons is substantially to arouse sexual desire. In determining whether a film is 'not suitable for young persons,' the Board shall consider the film as a whole, rather than isolated portions, and shall determine whether its harmful effects outweigh artistic or educational values such film may have for young persons."

Exhibitors are required to submit a proposed classification and a summary of the film's plot to the nine-member Board. If the Board is not satisfied with the proposed classification, a showing of the film is arranged. The details of the classification procedure, time limits and provisions for appeal will be discussed later.[2]

It is a violation of the ordinance to exhibit any film which has not been classified. If a film has been found not suitable for young persons, it is unlawful to fail to state the classification in any advertisement; to fail to post the classification prominently in front of the theatre; knowingly to sell or give a ticket to any young person or to permit one to view the film and to exhibit such a film with one classified as suitable for young persons.[3] A young person accompanied by his parent, guardian or spouse may view any film, whatever its classification.

The ordinance provides for the issuance of a license to entitle the holder to exhibit films classified as not suitable for young persons and revocation of that license for up to one year for repeated violations of the ordinance or for failure to exercise ordinary diligence to determine those below the age of sixteen. Violation of any provision of the ordinance is a misdemeanor punishable by fine up to $200.00 for each offense.

A group of Dallas exhibitors filed a complaint in federal District Court seeking a declaratory judgment that the or-

1. The ordinance is reprinted in full in the appendix.

2. See IV, infra.

3. There are other violations not particularly relevant to this proceeding. See Appendix, § 46A–4.

dinance in whole or part was unconstitutional and an injunction to prevent the City from enforcing the ordinance.[4]

Judge Hughes concluded that the City had the power to pass such an ordinance, that Article 527 of Vernon's Ann. Texas Penal Code prohibiting obscene pictures does not prevent this type of regulation by the City, that the classification was reasonable in order to prevent the incitement of juvenile crime and delinquency, and that a film may be obscene when viewed by young people although not obscene as to adults. She found the phrase "Not suitable for young persons" to be valid only to the extent

"that such films are obscene when viewed by an audience of young persons. * * * A film that is obscene when viewed by an audience of young persons is one which, to the average young person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to the prurient interest, substantially goes beyond the customary limits of candor in description or representation of such matters to the average young person, and is utterly without redeeming social importance."

Interstate Circuit, Inc. v. City of Dallas, N.D. Texas 1965, 249 F.Supp. 19, 24. The procedure for review of the Board's classifications was found to be sufficient to insure the exhibitors' right to a speedy determination of the issues and to guarantee due process of law. The District Court, however, held the clause providing for revocation of the exhibitor's license to show films classified as not suitable for young persons invalid since it would deny exhibitors the right to show films not obscene as to adults.[5]

Both the exhibitors and the City have appealed. A number of national distributors of films have been allowed to join the exhibitors on appeal as amici curiae.

## I.

Before examining the details of the Dallas ordinance, we must first decide the basic question of whether any movie classification ordinance may be found valid. Our study of the Supreme Court opinions indicates an affirmative answer.

When the Court first held that motion pictures were protected by the First Amendment in Joseph Burstyn, Inc. v. Wilson, 1952, 343 U.S. 495, 502–503, 72 S.Ct. 777, 780–781, 96 L.Ed. 1098, 1106, it considered the argument that "motion pictures possess a greater capacity for evil, particularly among the youth of a community, than other modes of expression." Its conclusion was that "[i]f there be capacity for evil it may be relevant in determining the permissible scope of community control, but it does not authorize substantially unbridled censorship * * *." The Court also noted that:

"To hold that liberty of expression by means of motion pictures is guaranteed by the First and Fourteenth Amendments, however, is not the end of our problem. It does not follow that the Constitution requires absolute freedom to exhibit every motion picture of every kind at all times and all places. That much is evident from the series of decisions of this Court with respect to other media of communication of ideas. Nor does it follow that motion pictures are necessarily subject to the precise rules governing any other particular method of expression. Each method tends to present its own peculiar problems."

In Butler v. State of Michigan, 1957, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412, the Court found unconstitutional a Michigan statute which made the distribution to the general public of publications "tending to the corruption of the morals of youth" a misdemeanor. The Court

---

4. A similar Dallas classification ordinance was considered by Judge Hughes and found invalid in part. Interstate Circuit, Inc. v. City of Dallas, N.D.1965, 247 F. Supp. 906. The present ordinance was passed to replace the one involved in that first case before Judge Hughes.

5. This ruling was based on Butler v. State of Michigan, 1957, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (see discussion, p. 6, infra), and is not contested here by the City of Dallas.

concluded that "quarantining the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence * * * [s]urely * * * is to burn the house to roast the pig." It is significant that the statute was invalidated solely because it reduced adults to reading material fit for juveniles. The recognition by the Court that the state had failed to reasonably restrict its legislation "to the evil with which it is said to deal" suggests the probable validity of a statute which is properly drawn to protect children without restricting First Amendment rights of adults.

A few months after the decision in *Butler,* the Court handed down the landmark case of Roth v. United States, 1957, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, holding obscenity outside the protection of the First Amendment and establishing the standard for judging obscenity—"whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." In adopting this test, the Court specifically rejected the *Hicklin* test [6] which judged obscenity by the effect of an isolated passage upon particularly susceptible persons. Id. at 489, 77 S.Ct. at 1311, 1 L.Ed.2d at 1509.

The *Roth* doctrine was reaffirmed and clarified in Jacobellis v. State of Ohio, 1964, 378 U.S. 184, 84 S.Ct. 1676, 12 L. Ed.2d 793. The Court noted that "a work cannot be proscribed unless it is 'utterly' without social importance * * *" and " 'goes substantially beyond customary limits of candor in description or representation of such matters.' " Id. at 191, 84 S.Ct. at 1680, 12 L.Ed.2d at 800. The "community" in the *Roth* test was described as the "society at large" rather than the inhabitants of a particular state or locale. The important portion of the opinion [7] for our present consideration, however, is a paragraph by Justice Brennan which states:

"We recognize the legitimate and indeed exigent interest of States and localities throughout the Nation in preventing the dissemination of material deemed harmful to children. But that interest does not justify a total suppression of such material, the effect of which would be to 'reduce the adult population * * * to reading only what is fit for children.' Butler v. Michigan, 352 U.S. 380, 383, 77 S.Ct. 524, 526. *State and local authorities might well consider whether their objectives in this area would be better served by laws aimed specifically at preventing distribution of objectionable material to children, rather than at totally prohibiting its dissemination.* [footnote: See State v. Settle, 90 R.I. 195, 156 A.2d 921 (1959)] Since the present conviction is based upon exhibition of the film to the public at large and not upon its exhibition to children, the judgment must be reviewed under the strict standard applicable in determining the scope of the expression that is protected by the Constitution." [8]

6. Regina v. Hicklin [1868] L.R. 3 Q.B. 360.

7. The Court had some difficulty in arriving at a consensus in *Jacobellis.* Justice Brennan announced the judgment of the Court and was joined in his opinion by Justice Goldberg. Writing concurring opinions were Justice Black (joined by Justice Douglas), Justice Stewart, and Justice Goldberg. Justice White concurred without an opinion. Dissenting opinions were written by Chief Justice Warren (joined by Justice Clark) and by Justice Harlan.

8. Four years before *Jacobellis,* Judge Wisdom made a similar suggestion in Louisiana News Co. v. Dayries, E.D.La. 1960, 187 F.Supp. 241, 247 (three-judge district court):

"While we have no occasion here to pass on the constitutionality of such a law, it would seem that a state might enact a valid statute 'specifically designed to protect its children' from suggestive books and magazines that are not too rugged for grown men and women, without at the same time burning the house down to roast the pig by restricting everyone else to reading such fiction as Boy's Life at the magazine stand and The Five Little Peppers at the bookstand."

378 U.S. at 195, 84 S.Ct. at 1682, 12 L.Ed. 2d at 802. (Emphasis added.)

The Rhode Island case, State v. Settle, supra, which the Court cites with approval, upheld a conviction under a statute making the sale of pornographic material to persons under the age of eighteen a crime.[9]

Although only Justice Goldberg joined in Justice Brennan's opinion, three other Justices indicated that they would uphold a statute aimed at the protection of children without a resulting restriction on the adult population. Chief Justice Warren, in an opinion joined by Justice Clark, observed that a work may be "inoffensive under most circumstances but, at the same time, 'obscene' in the extreme when sold or displayed to children." Id. at 201, 84 S.Ct. at 1685, 12 L.Ed.2d at 806. Justice Harlan made it clear that he favors allowing the state a wide scope in the field of regulating the distribution of obscene materials to children.[10] Id. at 203–204, 84 S.Ct. at 1686–1687, 12 L.Ed. 2d at 807. Thus, it appears that at least five of the Justices involved in *Jacobellis* believe that the state may protect children from the distribution of material which could not be classified as obscene as to adults.[11]

This position indicates an acceptance of the concept of "variable obscenity" as contrasted with "constant obscenity." Constant obscenity assumes that "obscenity is an inherent quality of material that renders it unfit for everyone in all circumstances. * * *" Lockhart & McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn.L.Rev. 5, 85 (1960); see Gerber, A Suggested Solution to the Riddle of Obscenity, 112 U.Pa.L.Rev. 834, 848–849 (1964); Note, "For Adults Only": The Constitutionality of Governmental Film Censorship by Age Classification, 69 Yale L.J. 141 (1959). On the other hand, variable obscenity rejects the idea of obscenity as inherent in the material and determines obscenity "by its appeal to and effect upon the audience to which the material is primarily directed." Lockhart & McClure, supra, at 85. Under constant obscenity, a work not obscene as to society at large by definition could not be found to be obscene as to any particular group such as children. Variable obscenity, however, permits a finding that material is obscene when distributed to one group although it would not be held obscene if it were primarily distributed to another group. For example, hard-core pornography would not be constitutionally "obscene" if directed exclusively to scientists for research purposes, even though such materials would clearly be obscene if distributed to the general public. United States v. 31 Photographs, S.D.N.Y.1957, 156 F.Supp. 350.

Any doubt as to the Court's position on variable obscenity was dispelled by the recent trilogy of obscenity cases: Ginzburg v. United States, 1966, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31;

9. "Every person who shall wilfully or knowingly sell, lend, give away, show, advertise for sale or distribute commercially to any person under the age of eighteen (18) years * * * any pornographic motion picture, or any still picture or photograph or any book, * * * the cover or content of which exploits, is devoted to, or is principally made up of descriptions of illicit sex or sexual immorality or which is obscene, lewd, lascivious, or indecent, or which consists of pictures of nude or partially denuded figures posed or presented in a manner to provoke or arouse lust or passion or to exploit sex, lust or perversion for commercial gain or any article or instrument of indecent or immoral use shall be punished * * *."
R.I. Gen.Laws 1956, § 11–31–10.

10. Justice Harlan referred to his earlier dissent in Bantam Books, Inc. v. Sullivan, 1963, 372 U.S. 58, 76–77, 83 S.Ct. 631, 642–643, 9 L.Ed.2d 584, 596–597, in which he discussed the problem at greater length.

11. The New York Court of Appeals, relying upon this reasoning, has recently upheld a New York obscenity statute barring distribution of certain books to minors which are not necessarily obscene as to adults. Bookcase, Inc. v. Broderick, 1966, 18 N.Y.2d 71, 271 N.Y.S.2d 947, 218 N.E. 2d 668.

Mishkin v. State of New York, 1966, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56; and A Book, etc. v. Attorney General, 1966, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed. 2d 1. While assuming in *Ginzburg* that the publications were not obscene in other contexts, the Court upheld a conviction on evidence of "exploitation of interests in titillation by pornography * * * with respect to material lending itself to such exploitation through pervasive treatment or description of sexual matters * * *." 383 U.S. at 475, 86 S.Ct. at 950, 16 L.Ed.2d at 41. Thus the Court rejected the proposition that obscenity is a matter inherent in the publication under all circumstances.

■ Mishkin v. State of New York, supra, involves a situation more closely analogous to our present consideration. Mishkin induced the publication and sale of a number of books "depicting various deviant sexual practices, such as flagellation, fetishism, and lesbianism * * *" His defense to the resulting obscenity prosecution was that these books did not appeal to the prurient interest of the "average" person and that the State had therefore failed to satisfy the requirements of the *Roth* test. In rejecting this contention, the Court made a significant adjustment of the *Roth*-prurient-appeal test in adopting a variable-obscenity approach to the problem:

> "*Where the material is designed for and primarily disseminated to a clearly defined deviant sexual group, rather than the public at large, the prurient-appeal requirement of the Roth test is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group.* The reference to the 'average' or 'normal' person in *Roth*, 354 U.S. at 489–490, 77 S.Ct. at 1311, does not foreclose this holding. [citing Lockhart and McClure's article, supra]. In regard to the prurient-appeal requirement, the concept of the 'average' or 'normal' person was employed in *Roth* to serve the essentially negative

purpose of expressing our rejection of that aspect of the *Hicklin* test * * * that made the impact on the most susceptible person determinative. We adjust the prurient-appeal requirement to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests of its intended and probable recipient group; and since our holding requires that the recipient group be defined with more specificity than in terms of sexually immature persons, it also avoids the inadequacy of the most-susceptible-person facet of the *Hicklin* test."

383 U.S. at 508, 86 S.Ct. at 963–964, 16 L.Ed.2d at 62. (Emphasis added.) The determination that the obscenity of material may be measured by its appeal to the prurient interest of its intended and probable recipient group is a repudiation of the basic concept of the constant obscenity theory and clearly marks the adoption of the variable obscenity doctrine by the Court.

■■ The acceptance of this variable obscenity approach indicates that the Supreme Court would uphold a properly drawn statute designed to regulate material obscene as to children so long as the legislation does not have the effect of reducing adults to a level of consumption fit for children. See Butler v. State of Michigan, supra. The motion picture classification statute presents a prime example of a means of protecting children without appreciably restricting adults. Lockhart and McClure in their excellent article on the censorship of obscenity [12] discussed the effects of such classification statutes and noted that they may indirectly prevent adults from seeing "Adults Only" films since the economic loss resulting from the exclusion of children from the audience may deter the production and exhibition of such movies. The same economic deterrent, however, is present when the general public is excluded from the audience which may properly utilize certain pornographic

12. Lockhart & McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn.L.Rev. 5, 87 (1960).

works suitable only for scientific research. Cf. United States v. 31 Photographs, supra; Ginzburg v. United States, supra, 383 U.S. at 471–475, 86 S.Ct. at 948–949, 16 L.Ed.2d at 38–40. For this reason we conclude, as did Lockhart and McClure, that a properly drafted classification statute is a constitutional method of protecting children from motion pictures obscene as to them.

## II.

The determination that a constitutional classification statute may be drawn brings us to the consideration of the Dallas ordinance presented here. It seeks to classify motion pictures as not suitable for young persons when they describe or portray certain levels of brutality, criminal violence, depravity, nudity, sexual promiscuity and extra-marital or abnormal sexual relations.[13] As noted earlier, Judge Hughes upheld the ordinance only to the extent "that such films are obscene when viewed by an audience of young persons." The classification standard, as restricted by Judge Hughes, clearly complies with the concepts of variable obscenity as adopted by the Supreme Court.

The more difficult question is whether the classification standard may go beyond restriction of obscenity to regulate the showing of movies depicting such things as excessive brutality and criminal violence as the Dallas ordinance seeks to do. Although numerous attempts to employ non-obscenity standards have been rejected by the Supreme Court,[14] those cases do not control this question for they involve total censorship statutes prohibiting the distribution of the offending material rather than limited classification ordinances affecting only those under sixteen years of age. See Note, 69 Yale L.J. 141, 150 (1959). Of course, the principal obstacle to classification based upon standards other than obscenity is the First Amendment, an obstacle not applicable to classification solely on grounds of obscenity. See Joseph Burstyn, Inc. v. Wilson, supra.

The City, however, argues that the restriction of the First Amendment rights of minors may be justified by the overriding concern of society for the protection of its youth. This argument finds support in Prince v. Commonwealth of Mass., 1944, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645, which involved a state law prohibiting a parent or guardian from permitting a minor within his control from selling magazines on public streets. Both the child and his guardian who was prosecuted for violating this statute were Jehovah's Witnesses, and the offense was the sale by the child of pamphlets published by that religious sect. The defense was based solely on freedom of religion under the First Amendment and the parental rights guaranteed by the due process clause. The Court recognized the child's right to exercise his religion and the parent's right to train and encourage the child's religious belief, but concluded that

" * * * the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. * * * And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.

" * * * The catalogue need not be lengthened. *It is sufficient to show* what indeed appellant hardly disputes, *that the state has a wide range of pow-*

---

13. See quoted portion of ordinance, supra, p. 592.

14. See cases cited in Note, 69 Yale L.J. 141, 142 n. 5–10, 150 n. 64 (1959).

*er for limiting parental freedom and authority in things affecting the child's welfare; and that this includes, to some extent, matters of conscience and religious conviction."*

Id. at 166–167, 64 S.Ct. at 442, 88 L.Ed. at 652. (Emphasis added.) The Court conceded that the legislation would have been invalid if applied to the sale of such items by adults but stated that

"the mere fact a state could not wholly prohibit this form of adult activity * * * does not mean it cannot do so for children. * * *

"The state's authority over children's activities is broader than over like actions of adults. * * * A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies. It may secure this against impeding restraints and dangers, within a broad range of selection."

Id. at 168, 64 S.Ct. at 443, 88 L.Ed. at 653. The restriction of the child's First Amendment freedom of religion allowed in *Prince* is analogous to the attempted classification of movies under the Dallas ordinance so as to regulate the child's First Amendment freedom of speech. Additional support for the City's position is found in the paragraph quoted from *Jacobellis* [15] which suggests legislation to prevent "the dissemination of material deemed harmful to children." [16] The use of "harmful to children" rather than "obscene as to children" may indicate that Justice Brennan envisioned the type of broad legislation found in the Dallas

ordinance rather than a restricted obscenity standard. Justice Brennan also stated that, since the statute in *Jacobellis* was not restricted in its effect to the protection of children, the Court must apply a "strict standard" in determining the constitutionality of the restriction.

█ As forceful as these arguments may be for the expansion of the scope of the classification standards, the long history of the misuse of the censorship power convinces us that the standard for classification must be restricted to the control of obscenity. In considering the classification approach, we cannot ignore the activities of the censors in the context of total censorship statutes.[17] Nor can we assume that their level of performance will materially differ in applying broad standards under classification statutes. Because of the very real threat to the adult's freedom of speech and expression, the Supreme Court has apparently limited censorship affecting adults to a narrowly defined area of obscenity. Although a classification ordinance measuring "obscenity" by its appeal to children rather than by its effect on society in general necessarily affords the censor a broader area of regulation, it does not set him "adrift upon a boundless sea amid a myriad of conflicting currents * * * with no charts" or vest in him "unlimited restraining control over motion pictures * * *" as statutes containing broader standards might do. See Joseph Burstyn, Inc. v. Wilson, 1952, 343 U.S. 495, 504–505, 72 S.Ct. 777, 782, 96 L.Ed. 1098, 1107–1108. While we recognize the interest of society

15. This Court recently made reference to this same quotation from *Jacobellis* in upholding an ordinance prohibiting the exhibition of motion pictures visible from a public road depicting "bare buttocks or the bare female breasts" as legislation "reasonably aimed at preventing the exhibition of objectionable pictures to children." Chemline, Inc. v. City of Grand Prairie, 5th Cir. 1966, 364 F.2d 721. Since the effect of the ordinance on First Amendment freedoms was found to be slight in comparison to the substantial public interest to be protected, this Court rejected the suggested necessity of satis-

fying the "clear and present danger" test. This Court even stated that it is improper "to ignore the special interest of children by failing to give separate consideration to the harmful effects of such pictures ·upon them. Id. at 725.

16. See quotation, page 594, supra.

17. See Justice Warren's description of the abuse in the censoring function catalogued in Times Film Corp. v. City of Chicago, 1961, 365 U.S. 43, 66–73, 81 S.Ct. 391, 407–409, 5 L.Ed.2d 403, 417–421 (dissenting opinion).

in protecting children, we find even the child's freedom of speech too precious to be subjected to the whim of the censor.

### III

■ Both the exhibitors and the distributors contend that the classification standards of the Dallas ordinance are unconstitutionally vague. Since we have concluded that the District Court was correct in limiting the application of the "not suitable for young persons" classification to films that are "obscene when viewed by an audience of young persons," we need not consider the alleged vagueness of provisions of the ordinance which purport to classify on a basis other than obscenity.

The Supreme Court considered the "vagueness" argument in *Roth* in its review of the federal obscenity statute ("obscene, lewd, lascivious, or filth * * or other publication of an indecent character") and a California statute ("obscene or indecent"). It was urged that the statutes did not provide reasonably ascertainable standards of guilt and therefore violated the constitutional requirements of due process.

"Many decisions have recognized that these terms of obscenity statutes are not precise. This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. ' * * * [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices * * *.' * * * These words, applied according to the proper standard for judging obscenity, already discussed, give adequate warning of the conduct proscribed and mark ' * * * boundaries sufficiently distinct for judges and juries fairly to administer the law * * *.' "

354 U.S. at 491–492, 77 S.Ct. at 1312–1313, 1 L.Ed. at 1510–1511. The classification standard of the Dallas Ordinance as restricted by the District Court [18] conveys the "sufficiently definite warning as to the proscribed conduct" required by the Supreme Court in *Roth*.

### IV.

■ The minimum procedural safeguards necessary for a motion picture censorship system to avoid constitutional infirmity were discussed at length by the Supreme Court in Freedman v. State of Maryland, 1965, 380 U.S. 51, 56–61, 85 S.Ct. 734, 738–740, 13 L.Ed.2d 649, 653–656. The Court first noted that "[a]ny system of prior restraints of expression comes to this Court bearing a heavy pre-

---

18. The portion of the classification standard which remains under the District Court's judgment is noted below in italics. The District Court's definition of obscenity as to young persons further modifies the italicized language.

"(1) Describing or portraying brutality, criminal violence or depravity in such manner as to be, in the judgment of the Board, likely to incite or encourage crime or delinquency on the part of young persons; or

"(2) *Describing or portraying nudity beyond the customary limits of candor in the community, or sexual promiscuity or extra-marital or abnormal sexual relations in such a manner as* to be, in the judgment of the Board, likely to incite or encourage delinquency or sexual promiscuity on the part of young persons or *to appeal to their prurient interest.*

"A film shall be considered 'likely to incite or encourage' crime delinquency or sexual promiscuity on the part of young persons, if, in the judgment of the Board, there is a substantial probability that it will create the impression on young persons that such conduct is profitable, desirable, acceptable, respectable, praiseworthy or commonly accepted. *A film shall be considered as appeal to 'prurient interest' of young persons, if in the judgment of the Board, its calculated or dominant effect on young persons is substantially to arouse sexual desire. In determining whether a film is 'not suitable for young persons,' the Board shall consider the film as a whole, rather than isolated portions, and shall determine whether its harmful effects outweigh artistic or educational values such film may have for young persons.*"

sumption against its constitutional validity." The Court enunciated the following requirements:

(1) The censor must have the burden of proving that the film is unprotected expression.

(2) Although advance submission of all films may be required, the procedure must require a judicial determination to impose a valid final restraint.

(3) The exhibitor must be assured that the censor will, within a specified brief period, either issue a license or go to court to restrain the showing of the film.

(4) Any restraint imposed prior to final judicial determination on the merits must be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution.

(5) Prompt final judicial decision must be assured.

The Court observed that "it is common knowledge that films are scheduled well before actual exhibition. * * * One possible scheme would be to allow the exhibitor or distributor to submit his film early enough to ensure an orderly final disposition of the case before the scheduled exhibition date—far enough in advance so that the exhibitor could safely advertise the opening on a normal basis." Ibid.

██ Briefly summarized, the Dallas ordinance provides for the following procedures: The exhibitor files a proposed classification prior to exhibition. If the Board fails to act within five days, the proposed classification is considered approved. If the Board is not satisfied, it must view the film at the "earliest time practicable," give the exhibitor opportunity to support his proposal, and make its decision within two days thereafter.

If any exhibitor files notice of non-acceptance of the Board's classification within two days after its filing, it then becomes the Board's duty to seek a temporary and permanent injunction from the Dallas district court within three days and to apply for hearing on the temporary injunction within five days. If the exhibitor requests that the matter be considered on the merits of the permanent injunction at the hearing the Board must waive its application for temporary injunction and join the exhibitor's request. If the injunction is granted and the exhibitor appeals to the Court of Civil Appeals, the Board must waive all statutory notices, file its reply to the exhibitor's brief within five days, and join the exhibitor in any motion to advance the cause on the docket. Similar provisions apply to appeal by the exhibitor to the Texas Supreme Court and to appeal by the Board from adverse decisions of the district court or the Court of Civil Appeals. If no injunction has been granted within ten days of notice of an exhibitor's non-acceptance, the Board's order is suspended.[19]

It seems obvious that this procedure complies with the standards established in *Freedman,* with the only possible objection being the length of time necessary to get a final adjudication on the merits. The ordinance provides for the Board's joinder in any motion to advance the case on the court docket and for numerous other devices to expedite the proceedings; but, of course, the City of Dallas cannot compel the state courts to afford the speedy relief requested.[20] Judge Hughes found, however, that the Texas courts make it a practice to advance cases involving the public welfare and that final judgment could be obtained from the Texas Supreme Court in less than thirty-five days.[21] The exhibitors here offered evidence that before the classifi-

19. See Appendix, §§ 46A–3, 46A–7.

20. Cf. Trans-Lux Dist. Corp. v. Maryland State Board of Censors, 1965, 240 Md. 98, 213 A.2d 235, 237–238 (State statute requiring courts to provide speedy review).

21. Judge Hughes found the provisions for judicial review in the first Dallas Classification ordinance insufficient under *Freedman,* but that ordinance did not contain provisions for waiver of statutory notice, filing of reply briefs within a short period or joinder in motions to advance. Interstate Circuit, Inc. v. City of Dallas, N.D.Tex.1965, 247 F.Supp. 906, 911, 916.

cation cases the City of Dallas had not been able to get the Court of Civil Appeals to hear an appeal in less than sixty-one days. However, in recent classification cases arising under the Dallas ordinance, that Court has advanced the cases on its docket and, in one case, heard an appeal six days after the filing of the motion to advance.[22] So long as the courts are willing to cooperate in this manner, *Freedman's* requirement for speedy judicial action on the merits and on review are satisfied.

The intervening distributors complain that the ordinance does not contain provisions to insure them adequate procedural safeguards. *Freedman,* however, does not require consideration of the distributor in censorship proceedings. It also would appear that the interests of the exhibitor and the distributor in a particular locale are sufficiently similar and that the working relationship between them is sufficiently close to give adequate protection to the distributors.[23]

### V.

The exhibitors argue that Article 527 of the Texas Penal Code preempts the field of regulating motion pictures. Although Article 527 does apply to obscene motion pictures, it specifically excludes the type of commercial films which the classification ordinance seeks to regulate.[24] A similar argument was rejected by the Texas Court of Civil Appeals in Janus Films, Inc. v. City of Fort Worth, Tex.Civ.App.1962, 354 S.W.2d 597, 599. Writ of error was refused (no reversible error) by the Texas Supreme Court in a per curiam opinion which noted that appellate review of the

trial court's granting or denying of a temporary injunction is limited to the question of abuse of discretion and that the Court of Civil Appeals should not have gone into the merits of the case. 163 Tex. 616, 358 S.W.2d· 589.

In Chemline, Inc. v. City of Grand Prairie, 5th Cir. 1966, 364 F.2d 721, this Court recently concluded that the Court of Civil Appeals' decision in *Janus Films,* although "not very convincing" in light of the Texas Supreme Court's opinion, controlled the determination of the question under the *Erie* [Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188] doctrine. Because of the nature of the precedent established by *Janus Films,* this Court issued the mandate but granted the defendant permission to file a delayed application for rehearing if a Texas appellate decision were subsequently rendered authoritatively contrary to the Court of Civil Appeals' decision in *Janus Films.*

*Janus Films,* however, is no longer the only Texas authority dealing with Article 527. The Texas Supreme Court has recently refused writ of error (no reversible error) in Interstate Circuit, Inc. v. City of Dallas, Tex.Civ.App.1966, 402 S.W.2d 770, 776, where the Court of Civil Appeals summarily dismissed the exhibitors' argument that Article 527 preempted the field of movie regulation. In view of this additional development in Texas law, we conclude that no provision for delayed application for rehearing need be granted as this Court did in Chemline, Inc. v. City of Grand Prairie, supra.

We have considered the remaining contentions of the parties and find them

---

**22.** See discussion in Interstate Circuit, Inc. v. City of Dallas, Tex.Civ.App.1966, 402 S.W.2d 770, 774. (Writ ref. n. r. e.)

**23.** See discussion in Interstate Circuit, Inc. v. City of Dallas, Tex.Civ.App.1966, 402 S.W.2d 770, 776 (writ ref. n. r. e.).

**24.** Section 5 of Article 527 contains the following language:
"The provisions of this Act shall not apply to any motion pictures produced or manufactured as commercial motion pictures which (1) have the seal under the Production Code of the Motion Picture Association of America, Inc.; or (2) legally move in interstate commerce under Federal Law; or (3) are legally imported from foreign countries into the United States and have been passed by a Customs Office of the United States Government at any port of entry."

without merit. The judgment of the District Court is

Affirmed.

WILLIAM HAROLD COX, District Judge, dissents.

## APPENDIX

### ORDINANCE NO. 11,284

An Ordinance Providing for the Amendment of Chapter 46 of the 1960 Revised Code of Civil and Criminal Ordinances of the City of Dallas by adding thereto a new chapter known as Chapter 46A; Providing for the establishment of a Motion Picture Classification Board; Outlining classification procedures; Defining Offenses related to the exhibition of films classified "Not Suitable for Young Persons"; Providing for the issuance, revocation and suspension of licenses; Providing for judicial review; Defining public nuisances; Providing for injunctive relief; Providing for an exception to State law; Providing for a severability clause; Providing for a Penalty; Providing for the repeal of Ordinance No. 10963 enacted by the City Council on April 5, 1965, and enacting this ordinance in lieu thereof; and Declaring an Emergency.

WHEREAS, the City Council after investigation on the part of the members of said Council and the hearing of evidence and testimony at a public hearing called for that purpose, is of the opinion and finds that certain commercially produced motion picture films are one of the contributing causes to juvenile delinquency, sexually promiscuous behavior, and along with other factors, tend to incite criminal behavior on the part of young persons; and

WHEREAS, the City Council is of the opinion that legislative action should be taken by this Council for the purpose of classifying the movies to which such young persons of school age are admitted without proper supervision; and

WHEREAS, the City Council is of the opinion and finds that a great portion of said movies are available for screening and for showing more than thirty days prior to their initial exhibition and that the benefits to the public will far exceed the burden placed upon the motion picture industry by having said movies screened and classified; and

WHEREAS, the City Council is of the opinion and finds that motion picture films possess a greater capacity for good and for evil among young persons of school age than most other modes of expression and are, therefore, affected with a public interest; Now, Therefore,

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF DALLAS:

SECTION 1. That Chapter 46 of the 1960 Revised Code of Civil and Criminal Ordinances of the City of Dallas, be, and it is hereby amended by adding thereto a new chapter known as Chapter 46A, consisting of Sections 46A–1 through 46A–11 inclusive, which shall read as follows:

### "CHAPTER 46A

### MOTION PICTURE CLASSIFICATION ORDINANCE

§ 46A–1 Definition of Terms

§ 46A–2 Establishment of Classification Board

§ 46A–3 Classification Procedure

§ 46A–4 Offenses

§ 46A–5 License

§ 46A–6 Revocation or Suspension of License

§ 46A–7 Judicial Review

§ 46A–8 Public Nuisances

§ 46A–9 Injunctions

§ 46A–10 Exception to State Law

§ 46A–11 Severability Clause

Section 46A–1. *Definition of Terms:*

(a) "Film" means any motion picture film or series of films, whether full length or short subject, but does not include newsreels portraying actual current events or pictorial news of the day.

(b) "Exhibit" means to project a film at any motion picture theatre or other public place within the City of Dallas to which tickets are sold for admission.

(c) "Exhibitor" means any person, firm or corporation which exhibits a film.

(d) "Young person" means any person who has not attained his sixteenth birthday.

(e) "Board" means the Dallas Motion Picture Classification Board established by Section 46A–2 of this ordinance.

(f) "Not suitable for young persons" means:

(1) Describing or portraying brutality, criminal violence or depravity in such a manner as to be, in the judgment of the Board, likely to incite or encourage crime or delinquency on the part of young persons; or

(2) Describing or portraying nudity beyond the customary limits of candor in the community, or sexual promiscuity or extra-marital or abnormal sexual relations in such a manner as to be, in the judgment of the Board, likely to incite or encourage delinquency or sexual promiscuity on the part of young persons or to appeal to their prurient interest.

A film shall be considered 'likely to incite or encourage' crime delinquency or sexual promiscuity on the part of young persons, if, in the judgment of the Board, there is a substantial probability that it will create the impression on young persons that such conduct is profitable, desirable, acceptable, respectable, praiseworthy or commonly accepted. A film shall be considered as appealing to 'prurient interest' of young persons, if in the judgment of the Board, its calculated or dominant effect on young persons is substantially to arouse sexual desire. In determining whether a film is 'not suitable for young persons', the Board shall consider the film as a whole, rather than isolated portions, and shall determine whether its harmful effects outweigh artistic or educational values such film may have for young persons.

(g) 'Classify' means to determine whether a film is:

(1) Suitable for young persons, or;

(2) Not suitable for young persons

(h) 'Advertisement' means any commercial promotional material initiated by an exhibitor designed to bring a film to public attention or to increase the sale of tickets to exhibitions of same, whether by newspaper, billboard, motion picture, television, radio, or other media within or originating within the City of Dallas.

(i) 'Initial exhibition' means the first exhibition of any film within the City of Dallas.

(j) 'Subsequent exhibition' means any exhibition subsequent to the initial exhibition, whether by the same or a different exhibitor.

(k) 'File' means to deliver to the City Secretary for safekeeping as a public record of the City of Dallas.

(l) 'Classification order' means any written determination by a majority of the Board classifying a film, or granting or refusing an application for change of classification.

(m) The term 'Board' as used and applied in subsection (a) of Section 46A–7 shall include the City of Dallas when attempting to enforce this ordinance and the City Attorney of the City of Dallas when representing the Board or the City of Dallas.

Section 46A–2. *Establishment of Board:*

There is hereby created a Board to be known as the Dallas Motion Picture Classification Board which shall be composed of a Chairman and Eight Members to be appointed by the Mayor and City Council of the City of Dallas, whose terms shall be the same as members of the City Council. Such members shall serve without pay and shall adopt such rules and regulations as they deem best governing their action, proceeding and deliberations and time and place of meeting. These rules and regulations shall be subject to approval of the City Council. If a vacancy occurs upon the Board by death, resignation or otherwise, the governing body of the City of Dallas shall appoint a member to fill such vacancy for the unexpired term.

The Chairman and all Members of the Board shall be good, moral, law-abiding

citizens of the City of Dallas, and shall be chosen so far as reasonably practicable in such a manner that they will represent a cross section of the community. Insofar as practicable, the members appointed to the Board shall be persons educated and experienced in one or more of the following fields: art, drama, literature, philosophy, sociology, psychology, history, education, music, science or other related fields. The City Secretary shall act as Secretary of the Board.

Section 46A–3. *Classification Procedure:*

(a) Before any initial exhibition, the exhibitor shall file a proposed classification of the film to be exhibited, stating the title of the film and the name of the producer, and giving a summary of the plot and such other information as the Board may by rule require, together with the classification proposed by the exhibitor. The Board shall examine such proposed classification, and if it approves same, shall mark it 'approved' and file it as its own classification order. If the Board fails to act, that is, either file a classification order or hold a hearing within five (5) days after such proposed classification is filed, the proposed classification shall be considered approved.

(b) If upon examination of the proposed classification a majority of the Board, is not satisfied that it is proper, the Chairman shall direct the exhibitor to project the film before any five (5) or more members of the Board, at a suitably equipped place and at a specified time, which shall be the earliest time practicable with due regard to the availability of the film. The exhibitor, or his designated representative, may at such time make such statement to the Board in support of his proposed classification and present such testimony as he may desire. Within two (2) days, the Board shall make and file its classification of the film in question.

(c) Any initial or subsequent exhibitor may file an application for a change in the classification of any film previously classified. No exhibitor shall be allowed to file more than one (1) application for change of classification of the same film. Such application shall contain a sworn statement of the grounds upon which the application is based. Upon filing of such application, the City Secretary shall bring it immediately to the attention of the Chairman of the Board, who upon application by the exhibitor shall set a time and place for a hearing and shall notify the applicants and all interested parties, including all exhibitors who may be exhibiting or preparing to exhibit the film. The Board shall view the film and at such hearing, hear the statements of all interested parties, and any proper testimony that may be offered, and shall within two (2) days thereafter make and file its order aproving or changing such classification. If the classification of a film is changed as a result of such hearing to the classification 'not suitable for young persons', the exhibitors showing the film shall have seven (7) days in which to alter their advertising and audience policy to comply with such classification.

(d) Upon filing by the Board of any classification order, the City Secretary shall immediately issue and mail a notice of classification to the exhibitor involved and to any other exhibitor who shall request such notice.

(e) A classification shall be binding on any subsequent exhibitor unless and until he obtains a change of classification in the manner above provided.

Section 46A–4. *Offenses:*

(a) It shall be unlawful for any exhibitor or his employee:

(1) To exhibit any film which has not been classified as provided in this ordinance.

(2) To exhibit any film classified 'not suitable for young persons' if any current advertisement of such film by such exhibitor fails to state clearly the classification of such film.

(3) To exhibit any film classified 'not suitable for young persons' without keeping such classification posted prominently in front of the theatre in which such film is being exhibited.

(4) Knowingly to sell or give to any young person a ticket to any film classified 'not suitable for young persons'.

(5) Knowingly to permit any young person to view the exhibition of any film classified 'not suitable for young persons'.

(6) To exhibit any film classified 'not suitable for young persons' or any scene or scenes from such a film, or from an unclassified film, whether moving or still, in the same theatre and on the same program with a film classified 'suitable for young persons'; provided that any advertising preview or trailer containing a scene or scenes from an unclassified film or a film classified 'not suitable for young persons' may be shown at any time if same has been separately classified as 'suitable for young persons' under the provisions of Section 46A–3 of this ordinance.

(7) To make any false or willfully misleading statement in any proposed classification, application for change of classification, or any other proceeding before the Board.

(8) To exhibit any film classified 'not suitable for young persons' without having in force the license hereinafter provided.

(b) It shall be unlawful for any young person:

(1) To give his age falsely as sixteen (16) years of age or over, for the purpose of gaining admittance to an exhibition of a film classified 'not suitable for young persons'.

(2) To enter or remain in the viewing room of any theatre where a film classified 'not suitable for young persons' is being exhibited.

(3) To state falsely that he or she is married for the purpose of gaining admittance to an exhibition of a film classified as 'not suitable for young persons'.

(c) It shall be unlawful for any person:

(1) To sell or give to any young person a ticket to an exhibition of a film classified 'not suitable for young persons'.

(2) To make any false or willfully misleading statement in an application for change of classification or in any proceeding before the Board.

(3) To make any false statements for the purpose of enabling any young person to gain admittance to the exhibition of a film classified 'not suitable for young persons'.

(d) To the extent that any prosecution or other proceeding under this ordinance, involves the entering, purchasing of a ticket, or viewing by a young person of a film classified 'not suitable for young persons', it shall be a valid defense that such young person was accompanied by his parent or legally appointed guardian, husband or wife, throughout the viewing of such film.

Section 46A–5. *License:*

Every exhibitor holding a motion picture theatre or motion picture show license issued pursuant to Chapter 46 of the 1960 Revised Code of Civil and Criminal Ordinances of the City of Dallas shall be entitled to issuance of a license by the City Secretary to exhibit films classified 'not suitable for young persons'.

Section 46A–6. *Revocation or Suspension of License:*

Whenever the City Attorney or any person acting under his direction, or any ten (10) citizens of the City of Dallas, shall file a sworn complaint with the City Secretary stating that any exhibitor has repeatedly violated the provisions of this ordinance, or that any exhibitor has persistently failed to use reasonable diligence to determine whether those seeking admittance to the exhibition of a film classified 'not suitable for young persons' are below the age of sixteen (16), the City Secretary shall immediately bring such complaint to the attention of the City Council who shall set a time and place for hearing such complaint and cause notice of such hearing to be given to the complainants and to the exhibitor involved. The City Council shall have

authority to issue subpoenas requiring witnesses to appear and testify at such hearing, and any party to such hearing shall be entitled to such process. If, after hearing the evidence, the City Council shall find the charges in such complaint to be true, it shall issue and file an order revoking or suspending the license above provided, insofar as it grants the privilege of showing such classified pictures, for a specific period not to exceed one (1) year, or may issue a reprimand if it is satisfied that such violation will not continue.

The City Council likewise, after notice and hearing, may revoke or suspend the license of any exhibitor who has refused or unreasonably failed to produce or delayed the submission of a film for review, when requested by the Board.

Section 46A–7. *Judicial Review:*

(a) Within two (2) days after the filing of any classification by the Board, other than an order approving the classification proposed by an exhibitor, any exhibitor may file a notice of non-acceptance of the Board's classification, stating his intention to exhibit the film in question under a different classification. Thereupon it shall be the duty of the Board to do the following:

(1) Within three (3) days thereafter to make application to a District Court of Dallas County, Texas, for a temporary and a permanent injunction to enjoin such defendant-exhibitor, being the exhibitor who contests the classification, from exhibiting the film in question contrary to the provisions of this ordinance.

(2) To have said application for temporary injunction set for hearing within five (5) days after the filing thereof. In the event the defendant-exhibitor appears at or before the time of the hearing of such temporary injunction, waives the notice otherwise provided by the Texas Rules of Civil Procedure, and requests that at the time set for such hearing the Court proceed to hear the case under the Texas Rules of Civil Procedure for

permanent injunction on its merits, the Board shall be required to waive its application for temporary injunction and shall join in such request. In the event the defendant-exhibitor does not waive notice and/or does not request an early hearing on the Board's application for permanent injunction, it shall nevertheless be the duty of the Board to obtain the earliest possible setting for such hearing under the provisions of State law and the Texas Rules of Civil Procedure.

(3) If the injunction is granted by the trial court and the defendant-exhibitor appeals to the Court of Civil Appeals, the Board shall waive any and all statutory notices and times as provided for in the Texas State Statutes and Texas Rules of Civil Procedure, and shall within five (5) days after receiving a copy of appealing exhibitor's brief, file its reply brief, if required, and be prepared to submit the case upon oral submission or take any other reasonable action requested by the appealing exhibitor to expedite the submission of the case to the Court of Civil Appeals, and shall upon request of the appealing exhibitor, jointly with such exhibitor, request the Court of Civil Appeals to advance the cause upon the docket and to give it a preferential setting the same as is afforded an appeal from a temporary injunction or other preferential matters.

(4) If the Court of Civil Appeals should by its judgment affirm the judgment of the trial court granting the injunction and the appealing exhibitor should file an application for writ of error to the Texas Supreme Court, the Board shall be required to waive any and all notices and times as provided for in the Texas State Statutes and the Texas Rules of Civil Procedure, and shall within five (5) days after receiving a copy of the application for writ of error, file its reply brief, if required, and be prepared to submit the case upon oral submission or take any other reasonable action requested by the ap-

pealing exhibitor to expedite the submission of the case to the Supreme Court and shall upon request of the appealing exhibitor, jointly with such exhibitor, request the Supreme Court to advance the cause upon the docket and to give it a preferential setting the same as is afforded an appeal from a temporary injunction or other preferential matters.

(5) If the District Court denies the Board's application for injunction, and the Board elects to appeal, the Board shall be required to waive all periods of time allowed it by the Texas Rules of Civil Procedure and if a motion for a new trial is required, shall file said motion within two (2) days after the signing of the judgment, (or on the following Monday if said period ends on a Saturday or Sunday, or on the day following if the period ends on a Legal Holiday), shall not amend said motion and shall obtain a hearing on such motion within five (5) days' time. If no motion for new trial is required as a prerequisite to an appeal under the Texas Rules of Civil Procedure, the Board shall not file such a motion. Within ten (10) days after the judgment is signed by the District Court denying such injunction or within ten (10) days after the order overruling the Board's motion for new trial is signed, if such motion is required, the Board shall complete all steps necessary for the perfection of its appeal to the Court of Civil Appeals, including the filing of the Transcript, Statement of Facts and Appellant's brief. Failure to do so shall constitute an abandonment of the appeal. On filing the record with the Court of Civil Appeals, the Board shall file a motion to advance requesting the Court to give a preferential setting the same as is afforded an appeal from a temporary injunction or other preferential matters.

(6) If the Court of Civil Appeals reverses the trial court after the trial court has granted an injunction, or if the Court of Civil Appeals refuses to reverse the trial court after that court has failed to grant an injunction, then if the Board desires to appeal from the decision of the Court of Civil Appeals by writ of error to the Supreme Court of the State of Texas, it must file its motion for rehearing within two (2) days of rendition of the decision of the Court of Civil Appeals (or on the following Monday, if said period ends on a Saturday or Sunday, or on the day following if the period ends on a Legal Holiday), and shall file its application for writ of error within ten (10) days after the Court of Civil Appeals' order overruling such motion for rehearing, and failure to do so shall waive all rights to appeal from the decision of the Court of Civil Appeals. At the time of filing the application for writ of error, the Board shall also request the Supreme Court to give the case a preferential setting and advance the same on the docket.

(b) The filing of such notice of non-acceptance shall not suspend or set aside the Board's order, but such order shall be suspended at the end of ten (10) days after the filing of such notice unless an injunction is issued within such period.

(c) Failure of any exhibitor to file the notice of non-acceptance within two (2) days as required in Subdivision (1) of this Section 46A–7, shall constitute acceptance of such classification order and such exhibitor shall be bound by such order in all subsequent proceedings except such proceedings as may be had in connection with any application for change of classification under Subdivision (c) of Section 46A–3 above.

Section 46A–8. *Public Nuisances:*

The following acts are declared to be public nuisances:

(a) Any violation of Subdivisions (1), (2), (3), or (6), of Subdivision (a) of Section 46A–4 of this ordinance.

(b) Any exhibition of a film classified as 'not suitable for young persons' at which more than three (3) young persons are admitted.

(c) Any exhibition of a film classified as 'not suitable for young persons' by an exhibitor who fails to use reasonable diligence to determine whether persons admitted to such exhibition are persons under the age of sixteen (16) years.

(d) Any exhibition of a film classified as 'not suitable for young persons' by an exhibitor who has been convicted of as many as three (3) violations of Subdivisions (4) or (5) of Subdivision (a) of Section 46A–4 of this ordinance in connection with the exhibition of the same film.

Section 46A–9. *Injunctions:*

Whenever the Board has probable cause to believe that any exhibitor has committed any of the acts declared in Section 46A–8 above to be a public nuisance, the Board shall have the duty to make application to a court of competent jurisdiction for an injunction restraining the commission of such acts.

Section 46A–10. *Exception to State Law:*

Nothing in this ordinance shall be construed to regulate public exhibitions preempted by Article 527 of the Penal Code of the State of Texas, as amended.

Section 46A–11. *Severability Clause:*

"Should any section, subsection, sentence, provision, clause or phrase be held to be invalid for any reason, such holding shall not render invalid any other section, subsection, sentence, provision, clause or phrase of this ordinance, and the same are deemed severable for this purpose."

SECTION 2. That any person who shall violate any provisions of this ordinance shall be guilty of a misdemeanor and upon conviction thereof shall be subject to a fine not to exceed Two Hundred Dollars ($200.00) and each offense shall be deemed to be a separate violation and punishable as a separate offense, and each day that a film is exhibited which has not been classified according to this ordinance shall be a separate offense.

SECTION 3. That Ordinance No. 10963 heretofore enacted by the City Council of the City of Dallas on April 5, 1965, be and the same is hereby in all things repealed and held for naught, and this ordinance is enacted in lieu thereof.

SECTION 4. The fact that Ordinance No. 10963 previously passed by the City Council of the City of Dallas has been declared to be unenforceable in the Courts by the Federal District Court, creates an urgency and an emergency in the preservation of the public peace, comfort and general welfare and requires that this ordinance shall take effect immediately from and after its passage, and it is accordingly so ordained.

WILLIAM HAROLD COX,* United States District Judge (dissenting).

Impelled to the conclusion that Dallas Ordinance No. 11284 on its face violates the First Amendment Rights of these motion picture exhibitors, I would reverse the decision of the trial court on direct and cross appeal; and respectfully dissent from the majority to the contrary.

It is no longer debatable that motion pictures enjoy the protection of free speech under the First Amendment to the Constitution of the United States. Jacobellis v. State of Ohio, 378 U.S. 184, 84 S.Ct. 1676, says: "Motion pictures are within the ambit of the constitutional guarantees of freedom of speech and of the press. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L. Ed. 1098. But in Roth v. U. S. and Alberts v. California, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, we held that obscenity is not subject to those guarantees." [1]

---

* William Harold Cox, United States District Judge for the Southern District of Mississippi, sitting by designation.

1. The Court while considering a motion picture film for its fitness to be displayed in the *Jacobellis* case, supra, declined to abnegate its duty to protect First Amendment rights, saying: "Since it is only 'obscenity' that is excluded from the constitutional protection, the question whether a particular work is obscene necessarily implicates an issue of constitutional law," citing *Roth.*

It has not been intimated in any authoritative decision that such vested First Amendment rights may be dissipated by anything short of obscenity in such material as that term is defined by several decisions of the Supreme Court of the United States. It is not sufficient that a motion picture be objectionable or even odious and obnoxious in part, but the picture must be utterly without redeeming social value. The standard must be that of an average person, not on a community or state basis, but on a national basis in measuring First Amendment rights under the Constitution of the United States. *Jacobellis,* supra, says: "[T]hat the constitutional status of an allegedly obscene work must be determined on the basis of a national standard. It is, after all, a national Constitution we are expounding."

But this Dallas ordinance says nothing about obscenity, and the trial judge gave it a helpful nudge in that direction to provide the basis for the cross appeal here. But the Court could not by its proviso give, or ascribe to the ordinance something not said or to be found therein.

There is, indeed, sound basis in dicta found in many respected cases to the effect that states may take a critical look at pictures designed for viewing by young people under sixteen years of age, in the instant case; and that they may supervise such showings to see that these young minds are not polluted by any filth which is utterly without any redeeming social value or importance as determined by an average person on a national basis. That is the basic teaching of the landmark decision of Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304. That decision has been amplified and explained and broadened, but never retrograded. The *Roth* standards were so applied to an indictment under the Federal Obscenity Statute (18 U.S.C. § 1461) in Ginzburg

v. United States, 383 U.S. 463, 86 S.Ct. 942, and in Mishkin v. State of New York, 383 U.S. 502, 86 S.Ct. 958, involving the New York Obscenity Statute appearing as § 1141 New York Penal Code, McKinney's Consol.Laws, c. 40. Finally, the Supreme Court of the United States epitomized its *Roth* decision in A Book Named John Cleland's Memoirs of a Woman of Pleasure v. Attorney General of Commonwealth of Massachusetts, 383 U.S. 413, 86 S.Ct. 975.

This ordinance is assailed on the ground that it does not contain necessary standards and indispensable guides to vouchsafe the adequate protection of these First Amendment rights of these exhibitors; that it is vulnerable to the vagueness doctrine and does not have built into the ordinance itself any safeguard against devastating delays and chilling expense of litigation. The trial court again detected and valiantly tried to remedy this last mentioned infirmity by judicial fiat, but to no avail. There is nothing in this ordinance or the record to support the Court's optimism in finding that any litigation under this ordinance could be concluded in thirty-five days.[2]

These prior restraints upon free speech surely come before the Court bearing a heavy presumption against their Constitutional validity. It is noteworthy that not one of this nine member board need be a lawyer versed in detecting and deciding upon any of the niceties of the protected vested right of free speech. The dangers of a censor system of any kind and its vices are recountered in Freedman v. State of Maryland, 380 U.S. 51, 85 S.Ct. 734, where it is said:

"To this end, the exhibitor must be assured, by statute or authoritative judicial construction, that the censor will, within a specified brief period, either issue a license or go to court

2. With no intervening change in any fact or circumstance, in Interstate Circuit, Inc. v. City of Dallas on November 9, 1965 247 F.Supp. 906, 911, the Court said: "[T]here being no provision in the Texas statutes for prompt judicial re- view in the trial and appellate courts, and experience being that risk of delay is built into the Texas procedure, the Ordinance in question lacks sufficient procedural safeguards designed to obviate the dangers of a censorship system."

to restrain showing the film. Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution. Moreover, we are well aware that, even after expiration of a temporary restraint, an administrative refusal to license, signifying the censor's view that the film is unprotected, may have a discouraging effect on the exhibitor. See Bantam Books, Inc. v. Sullivan, supra. Therefore, the procedure must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license."

It may not be doubted that this ordinance is in reality one of limited censorship, though it is called a classification ordinance. Any such kind of censorship apparatus is said to be always fraught with danger and viewed with suspicion of its constitutional invalidity. Standards for testing and safeguards against expensive and extended litigation must be built into the ordinance to safeguard against the ultimate and effectual destruction of First Amendment rights. In Freedman v. State of Maryland, supra, the Court stated, "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." The operation of this ordinance must envision the existence of a strong presumption that the film contains protected free speech material and that the burden rests upon the board to overcome it. That is the rule applicable to the noncriminal aspect of this ordinance but it also has a criminal aspect. The *Freedman* case suggests some provisions for a statute to avoid chilling these protected rights of an exhibitor.

The municipality in this case undertook to unilaterally control the course of subsequent litigation, but the municipality is subject to the state statutes and rules of Court for disposition of cases and a time-table of litigation is not committed to the control of Dallas. The ordinance is thus lacking in its protection of a valuable right of due process. Two of the present Supreme Court Justices would not even approve such an ordinance if it complied with the *Freedman* rule, but would insist upon literal respect for these First Amendment rights and deny all paralyzing power to the censor. The attempts of the municipality to comply with this requirement are largely precatory in nature.

An analysis of § 46A–1(f) of this ordinance must be made for an understanding of the classification "not suitable for young persons." That is the heart of this ordinance. It was this provision which the trial court propped up by relating it to obscenity. There is thus submitted to an administrative board for its impressions and reactions, the examination of a film for their determination as to whether or not it is fit for exhibition to young persons under sixteen years of age. This ordinance says nothing about obscenity, but irrefragably invades that field under a different cloak —not as a censor, but as a classifier with the same power and effect. The Supreme Court says that obscene material finds no protection under the First Amendment and has indicated a modified standard for determination of obscenity where young persons are involved. In A Book Named John Cleland's Memoirs of a Woman of Pleasure v. Attorney General of Commonwealth of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, "We defined obscenity in Roth in the following terms: 'Whether to the average persons, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' 354 U.S., at 489, 77 S.Ct., at 1311. Under this definition, as elaborated in subsequent cases, three elements must coalesce: It must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the de-

scription or representation of sexual matters; and (c) the material is utterly without redeeming social value."

Section 46A–1 (Definitions) makes no provision for application of any given standards of morality or guides to be used and employed by the board in making its impressions and determinations as to the fitness of the particular film for exhibition. Thus, without any instructions on the subject of First Amendment rights, this board is set adrift among myriad shoals for the laudible purpose of protecting its young people from shows that they should not see and hear for their best interest. Yet, there are no procedural safeguards in this Dallas ordinance to safeguard and protect and vouchsafe to the exhibitor their First Amendment rights. We are told that Dallas is even now enforcing this ordinance as written.

Finally, § 2 of this ordinance provides: "That any person who shall violate any provisions (sic) of this ordinance shall be guilty of a misdemeanor" and upon conviction shall be fined two hundred dollars for each offense. It may be safely doubted that the average person could understand exactly that which is proscribed by this ordinance to avoid criminal punishment. While § 46A–4 is captioned "Offenses," this section is not all comprehensive of that which seems to be prohibited by this criminal provision. It may be well doubted that this ordinance thus conveys sufficiently definite warning as to the proscribed criminal conduct to define a valid criminal offense. It seems to follow as a matter of course that this ordinance is surely vulnerable to the Vagueness Doctrine as presently applied. It impinges upon the protected rights of motion picture exhibitors under the First Amendment as implemented by the Fourteenth Amendment to the Constitution of the United States.

With reluctance, I respectfully dissent for the reasons indicated.